# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF FORT MYERS GENERAL EMPLOYEES' PENSION FUND, and ALASKA LABORERS-EMPLOYERS RETIREMENT TRUST, on behalf of themselves and other similarly situated former stockholders of TOWERS WATSON & CO., | § § § § § § § § | No. 368, 2019 |
| | § § | Court Below: Court of Chancery |
| Plaintiffs-Below, Appellants, | § § § | of the State of Delaware |
| | § | C.A. 2018-0132-KSJM |
| v. | § § | |
| JOHN J. HALEY, VALUEACT CAPITAL MANAGEMENT, L.P., and JEFFREY UBBEN, | § § § § § | |
| Defendants-Below, Appellees. | § § § | |

Submitted: April 22, 2020
Decided: June 30, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN** and **TRAYNOR**, Justices; and **DAVIS**, Judge,[*] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED**.

Michael J. Barry, Esquire, Christine M. Mackintosh, Esquire, Grant & Eisenhofer P.A., Wilmington, Delaware. *Of Counsel*: Lee D. Rudy, Esquire, Geoffrey C. Jarvis, Esquire, J. Daniel Albert, Esquire, Stacey A. Greenspan, Esquire, Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania, for Appellants.

Raymond J. DiCamillo, Esquire, Daniel E. Kaprow, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware. *Of Counsel*: Richard S. Horvath, Jr., Esquire, Gavin P.W. Murphy, Esquire, Paul Hastings LLP, San Francisco, California for Appellees ValueAct Capital Management, L.P. and Jeffrey Ubben.

---

[*] Sitting by designation pursuant to Del. Const. Art. IV § 12.

Bradley R. Aronstam, Esquire, Roger S. Stronach, Esquire, Ross Aronstam & Moritz LLP, Wilmington, Delaware. *Of Counsel*: John A. Neuwirth, Esquire, Joshua S. Amsel, Esquire, Matthew S. Connors, Esquire, Amanda K. Pooler, Esquire, Sean Moloney, Esquire, Weil, Gotshal & Manges LLP, New York, New York for Appellee John J. Haley.

**VALIHURA**, Justice, for the Majority:

This appeal arises from the 2016 "merger of equals" between Towers Watson & Co. ("Towers") and Willis Group Holdings Public Limited Company ("Willis"). In June of 2015, the two publicly-traded firms executed a merger agreement with closing conditioned on the approval of their respective stockholders. Although Towers had stronger performance and greater market capitalization, under the agreement's terms, Willis stockholders were to receive the majority (50.1 percent) of the post-merger company. Towers stockholders were to receive a $4.87 per-share special dividend and would own the remaining 49.9 percent of the combined company. Moreover, the consideration per share of Towers stock was below the unaffected trading price.

Upon the merger's public announcement, several segments of the investment community criticized the transaction as a bad deal for Towers and a windfall for Willis. Towers' stock price declined and Willis's rose in reaction to the news. Proxy advisory firms recommended that the Towers stockholders vote against the merger, and one activist stockholder began questioning whether Towers' management's incentives were aligned with stockholder interests. The parties questioned whether Towers would be able to obtain stockholder approval.

Also after announcing the merger, ValueAct Capital Management, L.P. ("ValueAct"), an institutional stockholder of Willis, through its Chief Investment Officer, Jeffrey Ubben, presented to John J. Haley, the Chief Executive Officer ("CEO") and Chairman of Towers who was spearheading the merger negotiations, a compensation proposal with the post-merger company that would potentially provide Haley with a five-fold increase in compensation. Haley did not disclose this proposal to the Towers Board.

1

In light of the uncertainty of stockholder approval, Haley renegotiated the transaction terms to increase the special dividend to $10 per share. Towers eventually obtained stockholder approval of the renegotiated merger. The transaction closed in January 2016, and the companies merged to form Willis Towers Watson Public Limited Company ("Willis Towers"). Haley became the CEO of Willis Towers and was granted an executive compensation package with a long-term equity opportunity similar to ValueAct's proposal.

The merger spawned several lawsuits across different jurisdictions. The matter before us arose from separate stockholder actions that were filed in early 2018 and then consolidated in April 2018. In this matter, Towers stockholders alleged that Haley breached his duty of loyalty by negotiating the merger on behalf of Towers while failing to disclose to the Towers Board the compensation proposal that, according to the plaintiffs, "would increase his long-term equity incentive compensation from the approximately $24 million maximum equity compensation that he could have earned in his last three years as Towers' CEO to upwards of $140 million in his first three years as Willis Towers' CEO."[1] Plaintiffs alleged that this proposal misaligned Haley's incentives at a critical juncture in the negotiations, and incentivized him to seek no more of a dividend than he believed necessary to secure the Towers stockholders' approval. Plaintiffs further alleged that ValueAct and Ubben aided and abetted the breaches of fiduciary duty.

---

[1] App. to Opening Br. at A52 (Compl. ¶ 10).

The defendants moved to dismiss the complaint on November 16, 2018. The Court of Chancery dismissed the claims, holding that the business judgment rule applied because "a reasonable board member would not have regarded the proposal as significant when evaluating the proposed transaction," and further holding that plaintiffs had failed to plead a non-exculpated bad faith claim against the Towers directors. In view of its dismissal of the predicate breach of fiduciary duty claim, the court dismissed the aiding and abetting claim.

On appeal, plaintiffs contend that the Court of Chancery erred in holding that the executive compensation proposal was not material to the Towers Board. They argue further that because the predicate breach of fiduciary duty is adequately pleaded, the aiding and abetting claim survives as well. We hold that the Court of Chancery erred in granting the defendants' motion to dismiss the claim that Haley breached his fiduciary duty by failing to disclose material information to the Board. For the reasons more fully explained below, we REVERSE the decision below, and REMAND for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

We take the facts, for the most part, from the Verified First Amended Class Action Complaint ("Complaint"), and the Court of Chancery's recitation of the facts in its opinion (the "Opinion"),[2] which in turn, was drawn from the Complaint and documents incorporated into the Complaint.

---

[2] *In re Towers Watson & Co. S'holders Litig.*, 2019 WL 3334521 (Del. Ch. July 25, 2019) [hereinafter *Opinion*].

### A. The Parties and Relevant Non-Parties

Non-party Towers, a Delaware corporation, was a publicly traded professional services firm focused on helping organizations improve performance through risk management, human resources, and actuarial and investment consulting.[3] Prior to the merger, the Towers Board of Directors consisted of Haley, Victor F. Ganzi, Leslie S. Heisz, Brendan R. O'Neill, Linda D. Rabbitt, Gilbert T. Ray, Paul Thomas, and Wilhem Zeller. Haley served as the Chairman and CEO of Towers.

Non-party Willis was a publicly traded corporation chartered in Ireland and was in the global advisory, brokering, and solutions business. Dominic Casserley was the CEO of Willis, and James McCann served as Chairman of the Willis Board.

ValueAct, a Delaware limited partnership, managed over $15 billion on behalf of large institutional investors. Immediately preceding the merger, ValueAct was the second-largest stockholder of Willis, beneficially owning approximately 10.3 percent of Willis's outstanding shares. Ubben was the co-founder and Chief Investment Officer of ValueAct and a member of its Management Committee. Ubben served on Willis's Board of Directors from 2013 until the merger closed, and then subsequently served on the Willis Towers Board of Directors until November 17, 2017. During his tenure on the Willis Towers Board, Ubben served on the Compensation Committee.

We refer to the directors of Towers' Board, ValueAct, and Ubben collectively as the "Defendants," and Haley, ValueAct, and Ubben together as the "Appellees."

---

[3] App. to Opening Br. at A57 (Compl. ¶ 22).

4

City of Fort Myers General Employees' Pension Fund and Alaska Laborers-Employers Retirement Trust were Towers stockholders. We refer to them as "Plaintiffs."

*B. ValueAct's Investment in Willis*

ValueAct had held over five percent of Willis's equity since 2010, and held over ten percent of the outstanding ordinary shares by late 2014. ValueAct typically holds investments for three to five years, and its investment in Willis was approaching the end of its typical investment horizon.

Following the 2008 economic crisis, Willis posted flat earnings between 2008 and 2013, and experienced operating margin contraction between 2010 and 2013. Willis was also highly leveraged. In an effort to jumpstart the company, Willis replaced its CEO with Casserley in 2013, and in April 2014, announced a four-year restructuring plan. Ubben, attempting to salvage ValueAct's investment, reached out to Willis to consider strategic alternatives. Among these were a break-up of Willis (which management was reluctant to implement), or a business combination with Towers, which had a robust financial history and outlook that could benefit Willis.

*C. The Negotiations and Merger Agreement*

Willis, at Ubben's recommendation, began a review of strategic alternatives in late 2014. On January 26, 2015, Casserley met with Haley in London and raised the possibility of a business combination between Willis and Towers. The two agreed to discuss the possibility further, including with the members of their respective management teams, and agreed on a preliminary scope of work to further explore the possibility. On February 18,

2015, the two followed up on their discussion, refined the preliminary scope of work, and planned to meet to review their work on April 10.

On March 2, 2015, Haley exercised 106,933 Towers stock options (that had vested five years earlier) and sold the shares, which represented 55 percent of his stake in Towers. In a related appraisal action, Haley testified that he knew Towers' stock price could drop upon the announcement of a merger with Willis.

From January through April 2015, Haley and certain members of Towers management discussed the potential transaction with Willis. Of the Towers Board members, Haley kept only director Rabbitt apprised of the discussions during this time. On March 29, 2015, at Haley's allegedly unilateral direction, Towers entered into a nondisclosure agreement with Willis. On May 1, 2015, Haley and Casserley agreed that the companies would engage financial advisors, and on May 3, 2015, Haley hired Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") to serve Towers in that role.

On April 24, 2015, the ratings company Moody's downgraded the investment ratings outlook for Willis's unsecured debt from "stable" to "negative." This downgrade put Willis at risk of triggering certain provisions in its debt instruments. Willis needed to bring its leverage down. One strategy Moody's identified was to "recogniz[e] EBITDA from acquisitions."[4] On April 28, 2015, Willis announced that it had missed the estimated earnings per share by eight percent. Willis also reported an operating margin decrease of

---

[4] *Id.* at A64 (Compl. ¶ 48).

26.9 percent, or 280 basis points year-over-year. By contrast, on May 5, 2015, Towers reported positive earnings.

On May 4, 2015, Haley convened the Towers Board, allegedly for the first time, to discuss the potential merger with Willis. The Board then formed a special committee consisting of directors Rabbitt, Ganzi, O'Neill, and Thomas.

Haley spoke separately with Casserley and Willis's Chairman, James McCann, on May 11, 2015 to discuss the terms of the potential transaction. Haley originally proposed that Towers own the larger proportion of the post-merger company based on Towers' greater market capitalization. Willis, however, proposed the ownership should be based on certain financial metrics, which would result in Willis's stockholders owning the majority of the combined entity.

On May 14, 2015, Rabbitt contacted McCann to propose that Haley serve as CEO of the post-merger entity. The Towers Board convened on May 15, 2015 to discuss the transaction. Haley was excused from the discussions. The Board then decided to disband the special committee, concluding that the full Board could work just as efficiently, and "effectively left the task of negotiating the Merger to the now-conflicted Haley."[5] On May 19, 2015, McCann told Rabbitt that Willis agreed to make Haley CEO of the combined company.

On May 29, 2015, Haley and Casserley further discussed the terms of transaction, and according to Plaintiffs, Haley ceased pushing for Towers stockholders to own a

---

[5] *Id.* at A67 (Compl. ¶ 53).

7

majority of the combined company. Haley raised the possibility of a pre-merger special dividend to Towers stockholders, to "bridge portions of the differences in pro forma ownership."[6] They also discussed the Board composition of the post-merger company. Haley had reason to believe that Ubben would become a director of the new entity and perhaps even a member of its compensation committee. On June 1, 2015, Haley and Ganzi proposed an exchange ratio based on the 60-day volume weighted average price ("VWAP") of the shares that would result in Willis's stockholders owning approximately 51 percent of the combined company and Towers' stockholders owning the remaining 49 percent. Willis would also pay a $500 million dividend to Towers' stockholders.

ValueAct, which had been apprised of the negotiations and was in contact with Willis's financial advisor, Perella Weinberg Partners LP, expressed dissatisfaction with Towers' offer and the progress of negotiations. By email, Ubben demanded that Willis press Towers harder and "use ValueAct in this negotiation" by telling Towers that (1) ValueAct would not approve the merger without a reasonable premium; (2) there was no merger without ValueAct's support; and (3) ValueAct must meet Haley. Ubben threatened to break up and sell Willis if ValueAct's demands were not met.

On June 5, 2015, Casserley proposed a revised structure that did not include a pre-merger special dividend to the Towers stockholders, and that would result in Willis's stockholders owning approximately 50.1 percent and Towers stockholders owning approximately 49.9 percent of the combined entity. Two days later, ValueAct had a change

---

[6] *Id.* at A70 (Compl. ¶ 60).

8

of heart and emailed Perella to "hit the bid" (*i.e.*, accept the 60-day VWAP as the basis for the exchange ratio, and the $500 million special dividend). But before Casserley could convey that to Towers, Haley and Ganzi counter-offered with a $4.87 per-share special dividend (a $337 million dividend) and the agreed-upon exchange ratio as of June 5.

Casserley and Haley met in London on June 10 and agreed to merge on the terms proposed by Towers on June 7. Haley allegedly reached the agreement without the approval of the full Board, without Merrill Lynch's assistance, without considering standard valuation materials, and without considering the value for any synergies.

The Towers Board convened on June 14 to discuss the agreement-in-principle Haley had reached with Willis four days earlier. Meanwhile, Haley and members of his management team met with ValueAct on multiple occasions beginning in June 2015. The Board convened again on June 20 to listen to Merrill Lynch's valuation analysis presentation. Thereafter, Haley was excused from this meeting, and the Board continued to discuss the transaction.

On June 29, 2015, the Towers Board once again convened and was advised by Merrill Lynch that the transaction was financially fair to the Towers' stockholders, even though the merger consideration valued each share of Towers stock at $125.13, a nine percent discount to Towers' unaffected trading price. Unlike prior meetings, Haley was not excused from this meeting, and he participated in the discussions and voted on the transaction, which was unanimously approved. The finalized merger agreement was conditioned on stockholder approval, and called for mutual termination fees not to exceed $45 million in the event a majority of the stockholders of either entity failed approve the

9

transaction. Haley would serve as the CEO and a director on the Board of the post-merger entity, and each company was to designate six directors to the twelve-member Board. Concurrent with the parties' execution of the merger agreement, ValueAct executed a voting agreement with Towers, agreeing to vote its Willis shares in favor of the merger.

*D. The Negative Reaction, the Proposal, and Post-Signing Renegotiations*

The merger was announced on June 30, 2015. At the end of the trading day, Towers stock price dropped nearly nine percent to $125.80. Deutsche Bank noted in an analyst report entitled, "Thesis shifts from HC exchanges to Willis turnaround; downgrade to Hold," that "[t]he feedback we are getting so far is that [the Towers] investors are somewhat taken aback. We think if they do come around to the deal, it will take time."[7] Analysts also pointed out that it was a bad deal for Towers, noting the merger consideration represented a nine percent discount on share price. One Barclays analyst noted that Willis appeared to be extracting more value from the transaction than Towers. Analysts also lowered the price target for Towers shares. Articles and reports indicated that Towers stockholders were similarly disappointed by the merger terms.

By contrast, the trading price for Willis stock increased from $45.40 to $46.90, a 3.3 percent increase from the pre-merger trading price. Analysts increased their price targets, and Deutsche Bank published a research note entitled, "Towers Watson

---

[7] *Id.* at A76 (Compl. ¶ 75).

Combination Good for [Willis] Shareholders."[8]  Moody's also upgraded Willis's rating outlook to "stable" by virtue of the merger news.

Despite the sentiment on deal terms, the market apparently placed weight on Haley's involvement.  One analyst noted that, although the merger appeared to be unfair to the Towers stockholders, Haley has a "tremendous track record" for complicated acquisitions and the management team "has certainly earned some trust in terms of how it deals with integration."[9]  Deutsche Bank analysts also noted, "we trust CEO John Haley due to his track record of great deals . . . ."[10]  The investment bank Stifel echoed the sentiment and noted that "investors might be won over" given Haley's track record.[11]

Willis reported its quarterly financial results on July 29, 2015.  It had missed targets for quarterly organic growth, net income, and EBITDA.  Towers, on the other hand, announced on August 11, 2015 that it had remarkable results for the quarter and the year, beating street expectations.

On September 2015, ValueAct reached out to Haley and presented him with a three-page document entitled, "Towers Watson Compensation Review September 2015."[12]  The document, referred to by ValueAct personnel as an "executive compensation proposal," illustrated the value of Haley's long-term equity incentive compensation over a three-year

---

[8] *Id.* at A77 (Compl. ¶ 78).

[9] *Id.* at A79–A80 (Compl. ¶ 87) (emphasis omitted).

[10] *Id.* at A80 (Compl. ¶ 88).

[11] *Id.* (Compl. ¶ 89).

[12] *Id.* (Compl. ¶ 91)

period under three different scenarios: Haley's then-current plan over his last three years at Towers, worth approximately $24 million; Haley's then-current plan approximately doubled at the post-merger company to account for increased market capitalization (*i.e.*, double that of Towers); and ValueAct's proposed plan (the "Proposal"), which provided Haley an opportunity allegedly worth more than $140 million. Haley testified in the related appraisal action that he understood that under the Proposal, he could earn upwards of $165 million. The document also showed that ValueAct's Proposal would provide Haley with a long-term equity incentive compensation amount greater than that of the CEOs at two peer companies, both of which had greater market capitalizations than the post-merger entity.

Ubben emailed Haley on September 14, 2015 to follow up, saying, "I hope it was informative regarding how we work with our companies. We are excited about working with you and the new board. I forgot to mention we have purchased $50M of stock in [Towers] as an expression of this excitement."[13] ValueAct also suggested that it engage directly with Gene Wickes, Towers' Managing Director of Benefits, to further discuss executive compensation.

At the same time, Driehaus Capital Management LLC ("Driehaus"), a Towers stockholder, commenced a public campaign against the merger. Underwhelmed with the deal, it released a white paper on September 14, 2015 advocating that Towers stockholders vote against the merger, noting that:

---

[13] *Id.* at A82–A83 (Compl. ¶ 93).

- the Initial Merger Consideration was a 9% discount to Towers' Unaffected Trading Price;

- the Merger was a "takeunder" relative to the average U.S. M&A premium of 26.1%, as reported by Bloomberg;

- the trading price of Towers shares had dropped 15% since the Merger's announcement;

- in the past five years, Towers had outperformed the S&P 500 Index by 143%, while Willis had underperformed the S&P by 47%, and Towers had drastically underperformed the S&P 500 Index since agreeing to the Merger;

- Towers' EPS grew more than 80% since 2011, while Willis' EPS fell more than 22% during that same time period;

- Towers was worth between 39% and 53% more as a standalone company than by merging with Willis; and

- a key transaction issue was Willis' high leverage.[14]

Driehaus filed the white paper with the U.S. Securities and Exchange Commission ("SEC") on September 15, 2015, and the paper was published by *The Wall Street Journal* the next day.

Driehaus then filed an opposition letter with the SEC on October 8, 2015, stressing that "[o]ver the last few weeks, other shareholders have reached out with a number of their own concerns regarding the value destructive deal . . . we believe that the transaction will be voted down by Towers' shareholders."[15] It also noted that Haley was likely in line for

---

[14] *Id.* at A83–A84 (Compl. ¶ 95).

[15] *Id.* at A84 (Compl. ¶ 96).

13

a pay raise and asked rhetorically whether "Towers management has skin in the game? Are incentives aligned?"[16]

On October 13, 2015, Towers and Willis issued the proxy statement soliciting votes in favor of the merger, and setting the stockholder meetings for November 18, 2015. Notably, the proxy statement did not mention the Proposal, any discussions about the management's post-merger compensation, or the extent of ValueAct's role in the merger process.

On October 22, 2015, Driehaus filed another opposition letter with the SEC, noting that the price of Towers stock had dropped 12.2 percent since the merger announcement.

On October 26, 2015, after preparing with the help of ValueAct, Haley met with Institutional Shareholder Services ("ISS") to discuss the merger.

Willis announced its third-quarter results on October 28, 2015. It had missed street expectations for earnings per share. By contrast, Towers reported on November 2, 2015 that it had beat street expectations and its own guidance on revenue, EBITDA, and earnings per share. In light of Towers' financial results, Driehaus filed another opposition letter to the merger with the SEC on November 2, 2015.

On November 5, 2015, ISS issued a recommendation to stockholders to vote against the merger. During his deposition in the appraisal action, Ryan Birtwell, a partner at ValueAct, explained his surprise: "[I]t is challenging to get a 'yes' vote in a situation where

---

[16] *Id.* at A90 (Compl. ¶ 114) (internal quotations and formatting omitted).

ISS has recommended a vote against a deal."[17] Birtwell said to Ubben in an email, "This is obviously awful news. I am completely stunned."[18] The same day, Glass Lewis recommended that Towers stockholders vote against the merger and seek a better price.

With stockholder approval in a precarious place, McCann contacted Perella Weinberg to "make sure to get all of [ValueAct]'s thinking on the situation" following the recommendations.[19] ValueAct responded that it did not want Willis to revise its offer.[20] Allegedly, ValueAct developed a series of strategies designed to generate positive market sentiment for the deal. First, ValueAct had Willis issue a press release highlighting the benefits of the merger to the Towers stockholders. ValueAct then instructed Willis to talk to its legal team to look into whether Towers could change its bylaws so that non-votes would not count as "no" votes. Next, ValueAct and Haley worked together to solicit Towers' largest stockholders, including The Vanguard Group and BlackRock, Inc., to vote to approve the merger. Ubben emailed Vanguard and Blackrock directly, pleading that they take a stand against ISS and Driehaus.

---

[17] *Id.* at A86 (Compl. ¶ 103) (internal formatting omitted).

[18] *Id.* Plaintiffs suggest that no one should have been "stunned." They plead facts alleging that the merger, after its announcement, received terrible reviews in late June and early July, 2015, *id.* at A76–A77, A78 (Compl. ¶ 75–77, 80–81), that Towers was well aware of its investors' dissatisfaction, and that Towers' stockholder sentiment was strongly negative in September 2015. *Id.* at A79 (Compl. ¶ 86). Also, Driehaus launched its public campaign against the merger on September 14, 2015. *Id.* at A83–A84 (Compl. ¶ 95).

[19] *Id.* at A87 (Compl. ¶ 106).

[20] In a footnote in their Complaint, Plaintiffs mention that on November 10, 2015, Haley raised the issue of the need to increase the special dividend to $10, but Willis management instructed him to focus on soliciting Towers stockholders instead of renegotiating the merger consideration. *Id.* at A87 (Compl. ¶ 107 n.2).

15

On November 3, 2015, Towers publicly responded to Driehaus, filing an investor presentation with the SEC, touting Towers' existing compensation practices, and seeking to "set the record straight." It accused Driehaus of making demonstrably false statements regarding compensation to support its allegations of a conflict of interest. It further asserted that Towers' executive compensation growth had been modest, and was far outpaced by total shareholder return. It did not refer to ValueAct's compensation proposal.

On November 9, a Driehaus analyst, Matthew Schoenfeld, emailed Towers' director of investor relations, Aida Sukys, inquiring about Haley's relationship with ValueAct:

> In light of recent events, we have a few questions regarding Mr. Haley's relationship with ValueAct Capital. Specifically, shareholders are concerned that this relationship with [ValueAct] has impaired—and, more importantly, continues to impair—Mr. Haley's ability to negotiate in good faith on behalf of Towers Watson shareholders.[21]

Schoenfeld then asked a series of questions regarding communications between Haley and ValueAct that were not addressed in the proxy statement or the subsequent proxy update. Sukys responded generally that after the announcement of the merger, there had been "appropriate" discussions with ValueAct, and that the Board and management were acting in the best interest of the company's shareholders.

Following those vague responses, two days later, Schoenfeld emailed Sukys concerning a profanity-laced response he had received from Ubben.[22] Sukys replied that

---

[21] *Id.* at A90–A91 (Compl. ¶ 116).

[22] According to the Complaint, Schoenfeld reported that:

> I received an email from [Towers'] lawyer this evening. Earlier *today I was harassed by [Towers] folks. Yesterday, I was cursed out by Mr. Ubben* (there were fifty f-bombs directed at me in a 20 minute conversation—namely, "you little piece

Towers was merely responding to Schoenfeld's email inquiries into Haley's and ValueAct's communications.

In light of the uncertainty of stockholder approval, Haley and Ubben agreed to increase the special dividend to $10.00 per share. According to Plaintiffs, "Haley viewed the $10.00 special dividend not as the best deal he could get for *Towers stockholders* (to whom he owed fiduciary duties) but, rather, as the minimum amount necessary to secure the Stockholder Approval he needed to *push the Merger through* so he could secure the massive compensation Proposal Ubben had promised him."[23] Plaintiffs allege further that Haley did not attempt to renegotiate the exchange ratio with Ubben.

The Towers Board convened on November 17 to discuss the transaction. This was the first time the full Towers Board met in connection with the merger since June 29, 2015. According to Plaintiffs' Complaint, in the meeting, Haley did not disclose his post-closing compensation discussions with ValueAct or ValueAct's Proposal.[24] Towers director Ray, Chair of the Towers Board's Compensation Committee, testified in the related appraisal action that he would have wanted to know that Haley had been discussing his compensation

---

of f-cking sh-t," "shut the f-ck up," "you dumb f-cking a-hole," "go f-ck yourself"). It's enough.

*Id.* at A92 (Compl. ¶ 120).

[23] *Id.* at A92–A93 (Compl. ¶ 121) (emphasis in original).

[24] *Id* at A93–A94 (Compl. ¶ 123). The Court of Chancery's Opinion states that, "[a]ccording to handwritten notes of the November 17, 2015 Towers board meeting, Haley recounted his conversation with Ubben to the Towers board, and further told the board that the $10.00 amount '[d]idn't trouble [Ubben].'" *Opinion*, 2019 WL 3334521, at *6.

17

at the future company with Ubben and ValueAct, but did not receive such information, let alone information as to the magnitude of the raise that Haley stood to receive.

The next morning, Towers and Willis adjourned their respective stockholder meetings. That day, only 43.45 percent of the then-submitted votes of Towers stockholders were "for" the merger.

Later that day, the Willis Board agreed to the special dividend, conditioned on eliminating the termination fee for Willis, and increasing the termination fee for Towers to $60 million. The Towers Board met that afternoon and unanimously approved the new terms, subject to a final fairness opinion from Merrill Lynch. The opinion was given the next day. Based on the revised terms, the merger consideration was now valued at $128.30 per Towers share, a seven percent discount to the unaffected trading price. Towers then filed a press release with the SEC on Form 8-K announcing the amended merger agreement.

On November 19, 2015, Driehaus filed another letter with the SEC, stating that a true merger of equals would dictate a special dividend of $17.72. Similarly, ISS stated that the dividend should be at least $13.44, and even then, it would be historically the lowest discount of any "merger of equals" transaction. Glass Lewis reported that the merger was not structured in a manner that was fair or appropriately attractive for Towers stockholders. Glass Lewis further advised that remaining as a standalone company would be more attractive for the Towers stockholders. On the other hand, Glass Lewis said that it was a good deal for Willis and the merger consideration was "both a prudent and *frugal* response

18

by Willis to attempt to save the deal, in light of the significant value-creation opportunities and the favorable structure for Willis shareholders."[25]

On November 27, 2015, Towers filed the proxy update, disclosing that Towers executed an amendment to the voting agreement with ValueAct and confirming that the voting agreement was still in effect. But according to Plaintiffs, the proxy update failed to disclose Haley's proposed compensation package or ValueAct's role in the merger negotiations.

Towers convened a special stockholders meeting on December 11, 2015 to vote on the merger, and 62 percent of the Towers stockholders voted in favor of it. Willis also held a special meeting that day and received 95.5 percent votes in favor.

On December 22, 2015, the Towers Board nominated Ganzi, O'Neill, Rabbitt, Thomas, and Zeller to join Haley as Towers' director designees to the Board of the new company. Ubben was also designated as a Board member by Willis. The merger closed on January 4, 2016 to form Willis Towers.

*E. Haley's Executive Compensation Negotiations*

Post-closing, Ubben sat on Willis Towers' Board and Compensation Committee, and Wendy Lane chaired the Compensation Committee. The Compensation Committee engaged compensation consultant Semler Brossy Consulting Group LLC ("SBCG").

---

[25] App. to Opening Br. at A98 (Compl. ¶ 132).

19

On December 20, 2015, days after the stockholder vote, Lane contacted Ubben "to catch up on the conversations" between Haley and him regarding compensation.[26] Alex Baum, a partner and Vice President of ValueAct, sent Lane the Proposal that ValueAct had presented to Haley in September 2015. Baum also wrote that Birtwell and he were in the process of "tweaking this proposal" and attaching it to a larger deck that goes more in depth before sharing it with Haley and the Willis Towers Board. Baum also explained that, although Haley liked the Proposal, he wanted "even more leverage."[27]

About a month after the merger closed, SBCG circulated a proposal for Haley's equity incentive plan to Wickes (formerly Towers' Managing Director of Benefits). SBCG's proposal would have provided Haley with significantly less long-term equity incentive compensation than ValueAct's original Proposal. Wickes, now in his capacity as head of Willis Towers' Exchange Solutions Division, wrote, copying Haley: "*[W]e are not OK with this* proposal . . . . *The value in it is considerably less than the ValueAct structure and proposal we have been working with* and we believe it is a big step backwards from where we have been—*especially with the significant cut in the number of shares.*"[28] Haley also objected: "[W]e don't agree with this proposal . . . . *Gene Wickes and Gordon Gould have been working with [ValueAct Partners] . . . to adjust the original ValueAct proposal*. These discussions have been fruitful and *they arrived at a solution that is*

---

[26] *Opinion,* 2019 WL 3334521, at *6 (citing Compl. ¶ 135).

[27] App. to Opening Br. at A99–A100 (Compl. ¶ 135).

[28] *Id.* at A101 (Compl. ¶ 140) (emphasis in original).

*satisfactory to all of them*. Why this would not be presented to the Compensation Committee mystifies me."[29]

The Compensation Committee finalized Haley's compensation plan on March 1, 2016. Haley's employment agreement differed in some ways from the ValueAct Proposal, but notably, the employment agreement provided more potential upside than the Proposal. The Court of Chancery noted that the Proposal offered a 300 percent payout of long-term equity, while the Willis Towers definitive proxy statement refers to a 350 percent maximum opportunity under Haley's employment agreement.[30]

On May 31, 2017, ValueAct filed a Form SC 13D/A with the SEC, reporting that it was no longer a beneficial owner of more than five percent of Willis Towers' outstanding shares. Willis Towers reported that Ubben had resigned from the Willis Towers Board in November of that year.

*F. Related Litigations*

The merger inspired multiple waves of lawsuits in addition to this action. Certain Towers stockholders sued to preliminarily enjoin the merger, but they voluntarily dismissed the action after Towers supplemented its proxy materials.[31] After the merger

---

[29] *Id.* (Compl. ¶ 141) (emphasis in original).

[30] *Opinion*, 2019 WL 3334521, at *6 n.26 (comparing the Proposal, which offered a 300 percent maximum payout for achieving certain shareholder return milestones, with the proxy statement, which disclosed a 350 percent maximum payout for achieving certain shareholder return milestones). *See* App. to Opening Br. at A193 (Proposal); Joint App. to Answering Br. at B543 (Willis Towers Proxy).

[31] *Opinion*, 2019 WL 3334521, at *7 (citing *In re Towers Watson & Co. S'holders Litig.*, C.A. No. 11270-CB (Del. Ch.)).

closed, another stockholder group filed an appraisal petition in the Court of Chancery in March 2016.[32] In that action, plaintiffs obtained certain emails, depositions, and other discovery. The appraisal case settled in September 2017. Then, another stockholder filed an action in the United States District Court for the Eastern District of Virginia.[33] The federal action, which was dismissed, was on appeal at the time the Court of Chancery issued its ruling in in this case. After issuance of the Court of Chancery's decision, the United States Court of Appeals for the Fourth Circuit reversed that dismissal.[34] The Fourth Circuit noted plaintiffs' allegation that, "Haley, Towers' chief negotiator, had a significant conflict of interest that arose from his secret compensation agreement with Ubben," and held that it was substantially likely that Towers' and Haley's failure to disclose this conflict

---

[32] *Id.* (citing *In re Appraisal of Towers Watson & Co.*, C.A. No. 12064-CB (Del. Ch.)). Five class action complaints were filed in the Court of Chancery captioned: *New Jersey Building Laborers' Statewide Annuity Fund v. Towers Watson & Co., et al.*, C.A. No. 11270-CB (filed on July 9, 2015); *Stein v. Towers Watson & Co., et al.*, C.A. No. 11271-CB (filed on July 9, 2015); *City of Atlanta Firefighters' Pension Fund v. Ganzi, et al.*, C.A. No. 11275-CB (filed on July 10, 2015); *Cordell v. Haley et al.*, C.A. No. 11358-CB (filed on July 31, 2015); and *Mills v. Towers Watson & Co. et al.*, C.A. No. 11423 (filed on August 24, 2015). The *Stein* action was voluntarily dismissed on July 28, 2015. On August 17, 2015, the court entered a consolidation order. On September 9, 2015, the plaintiffs in the consolidated action filed a verified consolidated amended complaint.

[33] *See In re Willis Towers Watson PLC Proxy Litig.*, 2018 WL 3423859 (E.D. Va. July 11, 2018). In this matter, based on the same set of facts as the matter before us, a Towers stockholder filed a putative class action under Sections 14 and 20 of the Securities Exchange Act of 1934 alleging inadequate disclosures concerning Haley's conflict of interest. The U.S. District Court for the Eastern District of Virginia initially dismissed the claim, holding that the complaint was barred by the statute of limitations, and alternatively, that the plaintiff failed to allege a material non-disclosure.

[34] The United States Court of Appeals for the Fourth Circuit reversed, concluding that as alleged in the complaint, the stockholders did not know of the secret compensation discussions with Ubben, and that a jury could reasonably conclude that disclosing this information would have changed the total mix of information available to shareholders. *In re Willis Towers Watson PLC Proxy Litig.*, 937 F.3d 297, 304–05 (4th Cir. 2019).

was material to Towers' stockholders in voting on the merger.[35]  Another set of Towers stockholders filed a case in New York state court in October 2018 and voluntarily dismissed that action in April 2019.[36]

### G. The Court of Chancery Proceedings in This Matter

In the proceedings below, Plaintiffs relied on *Cinerama, Inc. v. Technicolor, Inc.*,[37] and argued that Haley suffered a material conflict, which he failed to disclose to the Towers Board, and which a reasonable Board member would have regarded as significant in evaluating the proposed transaction.  Plaintiffs also asserted that the directors of Towers' Board breached their fiduciary duties by failing to oversee Haley's negotiations.  As for their claim against ValueAct and Ubben, Plaintiffs alleged that they aided and abetted Haley's breach of fiduciary duty by presenting Haley with the Proposal to induce him to breach his fiduciary duties to Towers' stockholders by pressuring reluctant stockholders to vote for the merger, and by favoring Willis in the subsequent renegotiation.

Defendants moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6).  They argued that the business judgment rule presumptively applies given the nature of the merger and that the Plaintiffs failed to plead facts sufficient to rebut the business judgment rule.  Alternatively, they argued that under this Court's decision in

---

[35] *Id.* at 304.  The Fourth Circuit commented that it "addressed the same facts" as the Court of Chancery, but that it "part[ed] ways with that court in [its] assessment of the facts." *Id.* at 306 n.9. The defendants' petition for rehearing *en banc* was denied on September 27, 2019. *See* Opening Br. Ex. B.

[36] *Opinion*, 2019 WL 3334521, at *7 (citing Compl., *Naya Master Fund, LP v. Haley*, Index No. 654968/2018 (N.Y. Sup. Ct. Oct. 5, 2018)).

[37] 663 A.2d 1156 (Del. 1995).

*Corwin*, a fully informed stockholder vote required application of the business judgment rule.[38]  Because the court found the first issue dispositive, it did not address the second issue.

Plaintiffs did not dispute that the business judgment rule presumptively applied. Instead, they attempted to rebut the business judgment rule and invoke the entire fairness standard based solely on Haley's alleged conflict of interest.

The Court of Chancery granted the Defendants' motion to dismiss.  The court focused on Plaintiffs' claim that Haley's failure to inform the Towers Board of the Proposal constituted deceptive silence and fraud upon the Board, and specifically on Plaintiffs' claims that:  (i) Haley viewed the $10.00 dividend as the "minimum" of what stockholders would accept, and that Ubben reported that this amount "[d]idn't trouble him," and (ii) their contention that but for Haley's undisclosed conflicts and personal interest in seeing the merger through, Haley would have pressed the Willis Board for more than the "minimum" of what stockholders would accept.

The court held that "the facts alleged do not support a finding of deceptive silence, fraud on the board, or a conflicted negotiator gone rogue."[39]  It reasoned that the alleged failure to disclose the Proposal failed to rebut the business judgment rule because, at bottom, the Towers Board already knew that Haley would become the CEO of the combined company post-merger, that the combined company would be much larger, and

---

[38] *Corwin v. KKR Fin. Hldgs. LLC,* 125 A.3d 304 (Del. 2015).

[39] *Opinion*, 2019 WL 3334521, at *9.

thus, the CEO would be entitled to increased compensation. Knowing this potential conflict, the Towers Board nevertheless appointed Haley as the lead negotiator and it generally was kept apprised of negotiations. Further, the court held that the Plaintiffs failed to establish that a reasonable director would have considered the Proposal to be significant when evaluating the merger. The court reasoned that it "was a proposal only; it reflected a theory of compensation and upside potential in the event of pie-in-the-sky outcomes unconnected to any business plan or forecast."[40] Accordingly, it held that the business judgment rule applied. Because there was no predicate breach of fiduciary duty adequately pleaded, the court dismissed the aiding and abetting claims against ValueAct and Ubben.[41]

The Plaintiffs filed a timely notice of appeal on August 22, 2019. Plaintiffs appeal the dismissal only as to Haley, ValueAct, and Ubben.

## II. Standard of Review

This Court reviews *de novo* a decision to grant a motion to dismiss under Court of Chancery Rule 12(b)(6).[42] The Court will grant a motion to dismiss under Rule 12(b)(6) only if the "plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[43] When considering such a motion, the Court must "accept all well-pleaded factual allegations in the Complaint as true . . . [and] draw all

---

[40] *Id.* at *1.

[41] *Id.* at *12.

[42] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018); *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011); *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 100 (Del. 2013).

[43] *Morgan Stanley*, 27 A.3d at 536.

reasonable inferences in favor of the plaintiff."[44]  The court "is not required to accept every strained interpretation of the allegations,"[45] "credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor."[46]

### III.    Analysis

#### A. The Court of Chancery Erred in Dismissing Plaintiffs' Claim Against Haley.

Plaintiffs' theory on appeal is that Haley breached his fiduciary duty of loyalty by selling out Towers' public stockholders in exchange for a massive compensation package, promised by Ubben and ValueAct.  After allegedly engaging in the secret September 2015 meeting where Ubben presented this compensation plan that would pay Haley up to five times more than his compensation at Towers, Haley failed to disclose that proposal to the Towers Board.  Then, in a renegotiation of the merger, after it became clear it lacked the votes needed for approval, he allegedly agreed to the "minimum" increase in the special dividend needed to secure Towers' stockholders' approval of the deal.  Plaintiffs also contend that the Court of Chancery erred by ignoring stockholder disclosure cases in determining whether the alleged omissions were material to the Board.  We hold that Plaintiffs' theory is reasonably conceivable as pleaded and the claim should survive a motion to dismiss.

The business judgment rule presumptively applies because Towers' stockholders exchanged their shares in one widely-held public company for shares in another widely-

---

[44] *Id.*

[45] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[46] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

26

held public company.[47]  Thus, to state a claim, Plaintiffs must rebut the presumption that

Towers' directors "acted on an informed basis [*i.e.*, with due care], in good faith and in the

honest belief that the action taken was in the best interest of the company."[48]

As the claims asserted against Haley focus on the conduct of a single director, both

sides agree that in order to rebut the presumption of the business judgment rule, Plaintiffs

must adequately allege that (i) the director was "materially self-interested" in the

transaction, (ii) the director failed to disclose his "interest in the transaction to the board,"

and (iii) "a reasonable board member would have regarded the existence of [the director's]

material interest as a significant fact in the evaluation of the proposed transaction."[49]

"Absent such a showing, the mere presence of a conflicted director or an act of disloyalty

by a director, does not deprive the board of the business judgment rule's presumption of

loyalty."[50]

---

[47] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70–71 (Del. 1995) (no change of control where control of post-merger entity remains in "a large, fluid, changeable and changing market") (citation omitted).

[48] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

[49] *Cinerama, Inc.*, 663 A.2d at 1168 (citation omitted); *see also Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279–81 (Del. 1989) (applying entire fairness standard of review where insider directors failed to disclose that they tipped off their favored bidder in a way that tainted and manipulated the Board's deliberative process); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 707–12 (Del. 1983) (applying entire fairness standard of review and determining unfair dealing occurred where two insider directors failed to disclose a pricing analysis report they prepared for the benefit of the acquirer).  A plaintiff could also seek to demonstrate that the materially self-interested director controlled or dominated a majority of the Board, but no such allegations are made in this case. *See Cinerama*, 663 A.2d at 1169.

[50] *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *25 (Del. Ch. Jan. 25, 1999) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993)), *aff'd*, 741 A.2d 16 (Del. 1999).

27

In dismissing Plaintiffs' claims, the Court of Chancery held that, given what the Towers Board knew, the alleged self-interest was immaterial, and that a reasonable director would not have considered the Proposal to be significant when evaluating the merger. In so holding, the court found that three facts "foreclose an inference that the Towers board would have found the ValueAct compensation proposal significant,"[51] namely: (1) the Board already knew the combined entity would be larger and would generate a larger salary for Haley; (2) Haley kept the Towers Board generally apprised of the negotiations; and (3) the Proposal was merely a proposal. As we explain below, we disagree that these facts undercut the Plaintiffs' allegations when viewed in the light most favorable to them.

We consider first whether Plaintiffs have adequately alleged that Haley was materially self-interested in the merger. Plaintiffs contend that Haley's subjective expectation of compensation, which substantially exceeded the amount contemplated by the Board, motivated him to adopt a less aggressive stance in the merger renegotiations. They contend that the Board should have had the opportunity to consider whether the Proposal skewed Haley's conduct in that role. Plaintiffs also contend that the Court of Chancery erred by ignoring stockholder disclosure cases in determining whether the alleged omissions were material to the Board.

Appellees counter that the Proposal did not change the already-known potential conflict because the Board knew of Haley's future employment with the post-merger company when it allowed Haley to lead the negotiations. Appellees also contend that the

[51] *Opinion*, 2019 WL 3334521, at *9.

28

Proposal was not binding on anyone and that the stockholder disclosure cases are not relevant as the materiality standard is different in the stockholder voting context.

The issue here is whether the alleged omissions meet the legal definition of materiality. We hold that the Plaintiffs have adequately alleged that the Proposal altered the nature of the potential conflict that the Towers Board knew of in a material way.[52] "Material," in this context, means that the information is "relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking."[53] It is elementary that under Delaware law the duty of candor imposes an unremitting duty on fiduciaries, including directors and officers, to "not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations."[54] Further, "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests."[55]

In *Weinberger v. UOP, Inc.*,[56] for example, this Court found a violation of the duty of candor where two "inside directors" of a subsidiary corporation being merged into its

---

[52] In this regard, the Fourth Circuit similarly observed that:

> [Although] shareholders knew Haley would make more money after the merger . . . they didn't know that—before the merger had closed—Haley had entered secret discussions with Ubben, who was slated for a seat on [Willis Towers'] Compensation Committee, for a more than six-fold increase in his current compensation.

*Willis Towers*, 937 F.3d at 305.

[53] *Brehm v. Eisner*, 746 A.2d 244, 259 n.49 (Del. 2000).

[54] *Mills Acq. Co.*, 559 A.2d at 1283.

[55] *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939).

[56] 457 A.2d 701.

parent prepared a feasibility study for the exclusive use and benefit of the parent. The study had obvious significance to both entities, as it used the subsidiary's data to describe the advantages to the parent of ousting the minority within a certain price range. The two directors shared this information with the parent corporation but not with either of their fellow directors or the other stockholders of the subsidiary.[57] This Court observed that, "[t]his conduct hardly meets the fiduciary standards applicable to such a transaction,"[58] and that, "the matter of disclosure to the [subsidiary] directors was wholly flawed by the conflicts of interest raised by the [feasibility study]."[59]

As Appellees agree, it is "uncontroversial" that "material information about a potential director conflict should be disclosed to the board."[60] The cases cited by the Court of Chancery, namely, *Weinberger*, *Mills*, and *Cinerama*, have firmly embedded that basic principle in our law. Because the issue here involves a director's duty of disclosure to the Board, we agree that those cases offer useful guidance. But applying that firmly-embedded principle here leads us to the opposite conclusion, namely, that Plaintiffs sufficiently allege that Haley's interest in the Proposal rendered him materially interested in the transaction. Plaintiffs have adequately alleged that the Board would have found it material that its lead negotiator had been presented with a compensation proposal having a potential upside of nearly five times his compensation at Towers, and that he was presented with this Proposal

---

[57] *Id.* at 709.

[58] *Id.* at 708.

[59] *Id.* at 712.

[60] Haley Answering Br. at 32.

30

during an atmosphere of deal uncertainty and before they authorized him to renegotiate the merger consideration.

Although we need not look to the stockholder disclosure cases, we pause to address the parties' competing assertions about the relevance of those cases. In *Brehm v. Eisner*, we noted that the term "material," when used in the context of a director's obligation to be candid with the other members of the Board, "is distinct from the use of the term 'material' in the quite different context of disclosure to stockholders in which '[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'"[61] But as Appellees observe in their brief, most of the cases cited by Plaintiffs found the same information to be material to both directors and stockholders.[62] For example, in *Morrison v. Berry*, although our focus centered on the

---

[61] *Brehm*, 746 A.2d at 259 n.49. Delaware has adopted the federal standard for materiality in the shareholder disclosure context. *See Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.") (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976))). We reject any contention in the briefing that the Delaware standard differs from the federal standard in this context.

[62] Haley Answering Br. at 35 n.1. *See Weinberger*, 457 A.2d at 712 (noting that "the matter of disclosure to the [subsidiary] directors was wholly flawed by the conflicts of interest raised by the [feasibility study]," and that because the minority stockholders were also denied information, "an approval by a majority of the minority was meaningless"); *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at *12–13 (Del. Ch. Dec. 10, 2018) (finding it reasonably conceivable that stockholders lacked material information concerning seven items, including that the CEO and private equity bidder regularly communicated privately without the Board's knowledge or approval, the CEO and bidder negotiated price terms directly without Board approval, the CEO advised the bidder what offer the Board would accept, and that the CEO received word during his negotiations with the bidder that his position with the company was in jeopardy if it were not sold; and also finding that the plaintiff "has pled facts that support a reasonable inference that the Board was not fully informed of [the CEO's] conduct—as contemplated in [*Mills Acq. Co. v. MacMillan*]"); *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *33–34 (Del. Ch. Oct. 16, 2018) (director and adviser did not disclose to Board a tip that revealed that a bidder wanted

disclosures to stockholders, we reiterated the basic principle that "directors have an 'unremitting obligation' to deal candidly with their fellow directors."[63]   There, we considered allegations that a CEO had concealed from the Board that he and a bidder had an agreement that contemplated his "rolling over" his equity interest.   In considering whether the alleged omissions were material to the stockholders, we held that, "[a] reasonable stockholder would want to know the facts showing that [the CEO] had not been forthcoming with the board about his agreement with [the bidder] . . . ."[64] We also observed that the timing of the alleged agreement was material, because it "would have shed light on the depth of [the CEO's] commitment to [the bidder], the extent of [the CEO's] and [bidder's] pressure on the Board, and the degree that this influence may have impacted the structure of the sale process."[65]

---

to buy PLX, when that bidder would bid, and how much it wanted to pay, and thus, their failure to disclose this information "calls into question their motivations on behalf of PLX" and constituted a material omission in the Recommendation Statement), *aff'd*, 211 A.3d 137 (Del. 2019) (TABLE); *id.* at *47 (by withholding the tip from the rest of the Board, the director "breached his fiduciary duty and induced the other directors to breach theirs").  It is a basic proposition that directors must inform themselves of all material information prior to making a business decision. They cannot fulfill this responsibility if their fellow directors and/or advisers withhold material information from them.  *See RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 863 (Del. 2015) (concluding that "RBC's failure to fully disclose its conflicts and ulterior motives to the Board, in turn, led to a lack of disclosure in the Proxy Statement," and that, "[t]he Proxy Statement included materially misleading information that RBC presented to the Board in its financial presentation and omitted information about RBC's conflicts").

[63] 191 A.3d at 284 (citing *HMG/Courtland Prop., Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (quoting *Mills Acq. Co.*, 559 A.2d at 1283 and citing *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004) (finding director liable for breach of the fiduciary duty of loyalty for failing to "fulfill his obligation to be candid to his fellow directors," including by "purposely denying the [company's] board the right to consider fairly and responsibly a strategic opportunity within the scope of its Strategic Process and diverting that opportunity to himself.")).

[64] *Id.* at 284.

[65] *Id.* at 275.

In this case, although the materiality inquiry is different in the two contexts, we conclude that the allegedly omitted information would be material in either context. A reasonable stockholder likely would consider important in deciding how to vote, information about Haley discussing and receiving the Proposal amidst deal completion uncertainty, and information concerning Haley's relationship with ValueAct, and whether that relationship impaired his "ability to negotiate in good faith on behalf of Towers Watson shareholders."[66] This is evident from the inquiries Towers received from certain significant stockholders regarding Haley's discussions with ValueAct.[67]

Appellees strenuously counter that the alleged omissions are not material because ValueAct's presentation, even if deemed to have been a proposal, was not binding on anyone. We acknowledge that the Proposal was not binding.[68] But that is not the point. The fact that the Proposal was a not concrete agreement and had milestones requiring "Herculean" efforts did not relieve Haley of his duty to disclose to the Towers Board the deepening of the potential conflict, particularly in an atmosphere of considerable deal uncertainty. As this Court said in the seminal case, *Guth v. Loft*, a director's duty of loyalty

---

[66] App. to Opening Br. at A90–A91 (Compl. ¶ 116).

[67] Because the omitted information is material to both the Towers Board and stockholders, we need not consider Appellees' alternate ground for affirming the Court of Chancery, namely, that *Corwin* "cleansing" applies. *In Corwin*, we held that "the business judgment rule is invoked as the appropriate standard of review for a post-closing damages action when a merger that is not subject to the entire fairness standard of review has been approved by a fully informed, uncoerced majority of the disinterested stockholders." 125 A.3d at 305–06.

[68] *See, e.g.*, *C&J Energy Servs., Inc. v. City of Miami Gen. Emps. & Sanitation Emps' Ret. Tr.*, 107 A.3d 1049, 1065 (Del. 2014) (noting that pre-merger employment discussions were "not binding on the board of [the combined company], which must approve any compensation package").

33

"requires an undivided and unselfish loyalty to the corporation" and "demands that there shall be no conflict between duty and self-interest."[69] The duty of loyalty is derived from a "profound knowledge of human characteristics and motives."[70] Here, Plaintiffs are entitled to an inference that the prospect of the undisclosed enhanced compensation proposal was a motivating factor in Haley's conduct in the renegotiations to the detriment of Towers stockholders.[71] We emphasize that we make no finding that he did, in fact,

---

[69] 5 A.2d at 510. There is nothing inherently wrong with a Board delegating to a conflicted CEO the task of negotiating a transaction. *See In re OPENLANE, Inc. S'holders Litig.*, 2011 WL 4599662, *5 (Del. Ch. Sept. 30, 2011) (finding that, as the Board was aware of the CEO's possible employment after consummation of the transaction "and was fully committed to the process," and that even though the CEO, who led the negotiations, was conflicted, "his efforts in negotiating the Merger Agreement and dealing with other potential acquirers" did not "taint the process"). But the conflict must be adequately disclosed to the Board, and the Board must properly oversee and manage the conflict. *See, e.g.*, *RBC Capital Markets LLC*, 129 A.3d at 831, 850–57 (affirming trial court's findings that the Board failed to oversee the Special Committee, failed to become informed about strategic alternatives and about potential conflicts faced by advisors, and approved the merger without adequate information); *id.* at 855 (holding that, "[t]he record indicates that Rural's Board was unaware of the implications of the dual-track structure of the bidding process and that the design was driven by RBC's motivation to obtain financing fees in another transaction with Rural's competitor," and that, "[t]he Board, as a result, took no steps to address or mitigate RBC's conflicts"); *id.* ("While a board may be free to consent to certain conflicts, . . . directors need to be active and reasonably informed when overseeing the sale process, including identifying and responding to actual or potential conflicts of interest.").

[70] *Guth*, 5 A.2d at 510.

[71] *See, e.g.*, *Maric Capital Master Fund Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1179 (Del. Ch. 2010) (granting preliminary injunction to address proxy's disclosure that there were no compensation "negotiations" between management and the acquirer when there had been "extended discussions" about retaining management and the typical equity incentive package that could be expected, and thus, the proxy statement created "the materially misleading impression that management was given no expectations regarding the treatment they could receive" from the acquirer); *see also In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 98 (Del. Ch. 2007) (granting a limited preliminary injunction because the Special Committee tasked the CEO with negotiating a transaction, but the proxy statement failed to disclose that shortly before the acquirer, Carl Icahn, expressed interest in a going private transaction, the CEO asked Lear to change his retirement benefits to allow him to cash them in early). In *Lear*, the court explained that "the Lear stockholders are entitled to know that the CEO harbored material economic motivations that differed from their own that could have influenced his negotiating posture with Icahn." *Id.* That aspect of the *Lear* case is particularly apt here, even though it arises in the stockholder disclosure

subordinate the Towers stockholders' interests to his own, but at this point in the proceedings, we accept the well-pleaded allegations as true.[72]

Nor does the fact that Haley's compensation agreement ultimately differed from the Proposal negate its materiality, as Appellees suggest. Plaintiffs allege that Haley's new compensation package at Willis Towers following the closing of the transaction is substantially similar to the Proposal, but with even more risk and attendant reward, just as Haley had requested at the outset of his negotiations with ValueAct. Like the Proposal, his new plan included a front-loaded, long-term equity incentive award intended to cover a three-year period. Also like the Proposal, his new plan provided him with a disproportionate increase in value of his maximum long-term equity incentive compensation relative to the increase in size of the combined entity (as compared with Towers). His new package, according to Plaintiffs, put "the total compensation that Haley could earn at Willis Towers comfortably within range of the over five-fold increase ValueAct offered him in September 2015."[73]

---

context. In *Lear*, the retirement proposal, ultimately, was never embraced by the CEO or the Board. Even so, the court held that, "a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price." *Id*. at 114.

[72] *Olenik v. Lodzinski*, 208 A.3d 704, 714 (Del. 2019).

[73] App. to Opening Br. at A103 (Compl. ¶ 145). At Towers, Haley, according to Plaintiffs, received an aggregate maximum grant of 186,584 PSUs during his last three years. By contrast, Willis Towers allegedly gave Haley a maximum grant of 787,500 PSUs over a three-year period, increasing his maximum equity shares by a factor of more than four. Further, the $92.5 million grant date (*i.e.*, 2016) value of Haley's 787,500 Willis Towers PSUs would be worth more than $92.5 million on the vesting date (*i.e.*, December 31, 2018), and upwards of 4.76 times the value of the equity compensation Haley made in his last three years at Towers (*i.e.*, $19.4 million),

The Court of Chancery observed that the "potential payout Haley would receive for achieving milestones under the ValueAct presentation differed from Haley's eventual employment agreement; the agreement provided more potential upside than the ValueAct compensation proposal."[74] This observation, however, undercuts the court's observation that the Proposal reflected "upside potential in the event of pie-in-the-sky outcomes . . . ."[75] If the Proposal were completely "pie-in-the-sky," why would the Board ultimately approve a plan with even greater potential upside?[76] Plaintiffs are entitled to the reasonable inference that the Board, including Haley, believed the Proposal's milestones were attainable. As we confirmed in *Cinerama*, the materiality inquiry is a subjective test, and "*not* how or whether a reasonable person in the same or similar circumstances would be affected by a financial interest of the same sort as present in the case, but whether *this* director in fact was or would likely be affected."[77] Here, Plaintiffs allege that Haley

---

putting the total compensation he could earn at Willis Towers in the range of the over five-fold increase ValueAct offered him in September 2015. *Id.*

[74] *Opinion*, 2019 WL 3334521, at *6.

[75] *Id.* at *1.

[76] Notably, ValueAct and Ubben argue in their brief that, "the hypothetical, pay-for-outperformance structure was not so egregious that Mr. Ubben would have known of an exploitable conflict of Mr. Haley's," and that, "[b]y tying any upside awarded to Herculean outperformance by Mr. Haley, and penalizing him for underperformance or even market performance, the alleged hypothetical compensation structure was eminently reasonable and not egregious." ValueAct Answering Br. at 21–22.

[77] *Cinerama*, 663 A.2d at 1167 (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1151 (Del. Ch. 1994)) (internal formatting omitted); *see also In re Atheros Commc'ns S'holder Litig.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) (finding that the "incentives are so great" in the advisor's contingency fees that "stockholders should be made aware of them and that this contingent fee structure is material to their decision to support or oppose the Transaction"); *Orman v. Cullman*, 794 A.2d 5, 29 n.62 (Del. Ch. 2002) (discussing cases where allegations did not establish directors' financial interest, but noting that, "these cases were based on circumstances in which the fees paid to directors were customary and usual in amount," and that the Court of

thought the upside was attainable and point to Haley's comment that he wanted "even more" upside than what was provided in the Proposal. And it appears that he ultimately got it.

Moreover, Haley delegated to Wickes the authority to negotiate on his behalf, and Haley reacted negatively when Willis Towers' consultant initially proposed something different following the closing of the merger. Even if ValueAct and Ubben could not bind Willis Towers to a compensation agreement, Ubben's influence over Haley's compensation was allegedly enough to convince Haley to agree to unfavorable terms in the merger renegotiations in order to benefit himself by obtaining a lucrative compensation deal. ValueAct was a significant Willis stockholder and proponent of the transaction. Ubben was involved in the negotiations, participated in driving Willis's negotiating strategy, and was likely to be a Board and compensation committee member of the post-merger entity.[78] Thus, Plaintiffs have adequately pleaded that Haley subjectively believed that the compensation increase set forth in the Proposal was attainable, and that the Proposal carried weight, even if it were of a non-binding nature.

---

Chancery's "view of the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee").

[78] In this regard, Plaintiffs allege that, "on May 29, 2015, Haley and Casserley discussed the composition of the board of the post-Merger entity," and thus, "when Ubben enticed Haley in September 2015 with a massive post-Merger compensation proposal as Willis Towers' CEO, Haley had reason to believe that Ubben would, at the very least, be a member of the Willis Towers Board (and, perhaps, even a member of the Compensation Committee) with the ability to ensure Haley's receipt of a massive pay raise." App. to Opening Br. at A70 (Compl. ¶ 61).

37

Next, we conclude that Plaintiffs adequately allege that Haley failed to inform the Towers Board of his deepened interest in the transaction. That Haley kept the Towers Board generally apprised of negotiations, as the Court of Chancery found, does not rebut Plaintiffs' contention that Haley failed to adequately disclose his self-interest to the Board. Even assuming that Haley kept the Towers Board generally apprised of the negotiations, he allegedly did not disclose that he had received the Proposal and had discussed executive compensation with ValueAct and Ubben.[79] The Court of Chancery noted that Plaintiffs "do not allege that Haley remained silent" since they allege that Haley had discussed the Proposal with Wickes.[80] But, Wickes was a Towers officer—the Managing Director of Benefits—and not a Board member. Even more, Plaintiffs allege in their Complaint that Board member and Compensation Committee Chair Ray testified that "he would have wanted to know that Haley was discussing his compensation at the future company with Ubben and ValueAct, but did not receive such information, let alone information as to the magnitude of the raise that Haley stood to receive."[81] Thus, Plaintiffs have adequately pleaded that Haley failed to disclose the Proposal to the Towers Board.

---

[79] Appellees argue that the Plaintiffs have no basis to argue that Haley did not disclose the September 2015 meeting with ValueAct to the Board, and that in the lead plaintiff hearing, Plaintiffs' counsel said that they could make that allegation consistent with Court of Chancery Rule 11. But, in his briefing before this Court, Haley does not deny that he did not tell the Board about the Proposal. Notably, Haley contends, instead, that, "[d]isclosure of the ValueAct presentation, or the September 15 meeting more generally, would not have substantially altered the total mix of information regarding Mr. Haley's potential conflict, including because the Board had disclosed the material facts about the renegotiation of the Merger." Haley Answering Br. at 4.

[80] *Opinion*, 2019 WL 3334521, at *5.

[81] App. to Opening Br. at A94 (Compl. ¶ 123).

38

Finally, Plaintiffs have adequately pleaded that a reasonable Board member would have regarded Haley's material interest in the Proposal as a significant fact in evaluating the merger. This conclusion is also supported by Ray's testimony that he would have wanted to know that Haley was discussing his compensation at the future company with Ubben and ValueAct. As to this point, the court observed that, "[f]rom the extensive discovery uncovered from the appraisal action, Plaintiffs point out that Towers director Ray stated during his deposition that he would have wanted to know that Haley discussed compensation at the future company with Ubben and ValueAct.[82] The court then concluded, without explanation, that, "[t]his does not satisfy the standard that a reasonable board member would have regarded the existence of the ValueAct compensation proposal as a significant fact in the evaluation of the proposed transaction."[83] We disagree that Ray's alleged testimony should be summarily discounted as insignificant. Ray's statement, allegedly given under oath in a deposition, that he would have wanted to be informed of this information is significant, particularly given his position as Chair of the Towers' Compensation Committee. There are no suggestions that Ray was anything other than a disinterested and independent director.

Thus, we conclude that Plaintiffs have alleged sufficiently that Haley was materially interested in the merger, that he failed to disclose his interest in the Proposal to the Towers Board, and that a reasonable Board member would have regarded the existence of Haley's

---

[82] *Opinion*, 2019 WL 3334521, at *8 n.46; *see also* App. to Opening Br. at A94 (Compl. ¶ 123).

[83] *Opinion*, 2019 WL 3334521, at *8 n.46.

material interest as a significant fact in the evaluation of the merger. Accordingly, we hold that Plaintiffs have adequately pleaded their claim for breach of fiduciary duty against Haley and, thus, the claim will survive a motion to dismiss.

> ### B. We Remand to the Court of Chancery the Claims of Aiding and Abetting Breaches of Fiduciary Duty.

The Court of Chancery dismissed claims against ValueAct and Ubben because there was no predicate breach of fiduciary duty pleaded. To find ValueAct and Ubben liable for aiding and abetting a fiduciary duty breach, Plaintiffs must show: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.[84] Although the Court of Chancery did not consider the other elements of the claim, Plaintiffs suggest that this Court should rule on them in this appeal. We think the better course is for the Court of Chancery to consider those elements in the first instance. Accordingly, we direct the Court of Chancery to consider the aiding and abetting issues on remand.

## IV. Conclusion

For the reasons set forth above, we REVERSE the Court of Chancery's opinion, and REMAND for proceedings consistent with this opinion.

---

[84] *Townson*, 780 A.2d at 1096.

**VAUGHN**, Justice, dissenting:

I agree with the legal principles the Majority applies in arriving at its decision. I dissent simply because when I apply those principles to the facts as pled in the complaint, I come to a different conclusion.

It is obvious that Haley was materially self-interested in the transaction and the Towers Board was aware he was materially self-interested. Haley became conflicted when the Towers Board, through director Rabbitt, proposed to the Willis Board that Haley serve as CEO of the combined company. At that point it was known to all concerned that Haley would be in line for a substantial increase in compensation if the merger took place. Despite knowing that Haley had a conflict which potentially could affect the negotiations, the Towers Board evidently felt comfortable with that conflict, as it allowed Haley to continue to serve as Towers' primary negotiator notwithstanding Haley's significant financial interest in a successful merger.

The question is whether the complaint adequately alleges that the undisclosed September 2015 ValueAct compensation presentation rendered Haley's conflict such that a reasonable board member would have regarded the existence of his material self-interest as a significant fact in the evaluation of the renegotiated merger agreement.[85] My answer to that question is no.

The complaint does not allege any facts suggesting that Haley discussed his potential post-merger compensation with Ubben after ValueAct made its presentation. In

---

[85] *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995).

41

an exchange of emails on September 14, 2015, Haley thanked Ubben for the presentation. An email the next day from a ValueAct representative to Haley indicates that Haley said that it might be useful if ValueAct discussed the presentation with Gene Wickes, Towers' Managing Director of Benefits. The complaint does not indicate whether ValueAct followed up with Wickes prior to closing. The complaint does not allege that Haley engaged in any discussions or negotiations over his compensation with anyone on the Willis side of the transaction until the shareholders of both companies approved the merger.

The complaint alleges that Ray, a member of the Towers Board and Chair of its Compensation Committee, testified in an appraisal proceeding that he would have wanted to know that Haley was discussing his compensation at the future company with Ubben, but the averment does not indicate what director Ray meant by "discussing his compensation"[86] and whether that would have included Haley listening to the September 2015 ValueAct presentation and thanking Ubben for that presentation. Director Ray's isolated answer does not, in my mind, rise to the level of a well-pled allegation. Nor is it an allegation that the director would have considered the presentation significant in his decision to approve the renegotiated merger agreement.

In my view, the September 2015 ValueAct presentation did not alter or add anything material to the nature of Haley's already disclosed material self-interest. The fact that the ValueAct presentation had the potential of a high payout to Haley did not change or significantly add to the fact that the Towers Board was aware that he would be receiving a

---

[86] App. to Opening Br. at A94 (Compl. ¶123).

significant pay raise as CEO of the combined company.  I would find that even under the "reasonably conceivable" pleading standard,[87] the complaint fails to plead facts showing that the Towers Board would have considered the ValueAct presentation as a significant fact in deciding whether to approve the renegotiated merger agreement.

I would affirm the Vice Chancellor's decision to dismiss the complaint.

---

[87] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011) (en banc).